46  125
174  458

## JAMES THOMPSON

*v.*

## ALEXANDER M. BRUEN *et al.*

1. NOTICE—*when a purchaser of lands will not be affected by notice of a contract, made by his grantor with another, for a conveyance of the same premises.* Where a purchaser has lost his right to compel a specific performance of a contract for the conveyance of lands, he cannot assert any rights or equities against another, who may purchase the premises, even though such other person has full knowledge of the contract at the time of his purchase.

2 CHANCERY—*when a specific performance will not be decreed.* Even, where time is not the essence of the contract, equity will not decree a specific performance. if the purchaser has been guilty of gross *laches* in performance of his agreement.

3. SAME—*a purchaser—when deemed guilty of gross laches.* Where by the terms of a contract for the conveyance of land, a certain sum was to be paid down, and the balance of the purchase price was payable in two equal instalments, the last one falling due two years from the date of the contract, and the purchaser for the period of about eight years thereafter, failed to make any further payment, and the premises were sold to another: *Held,* that the purchaser could not compel a specific performance of the contract, being guilty of such gross and inexcusable *laches,* as gave to the other party the power to rescind the contract, and sell to another.

APPEAL from the Circuit Court of Mercer county ; the Hon. JOHN S. THOMPSON, Judge, presiding.

This was a bill in chancery, filed by the appellant in the court below, against the appellee and others, to compel a

specific performance of a certain contract made by appellee, with Holloway and Boggess, for the conveyance to the last named parties, of a tax title held by him, to the S. W. ¼ of section 33 in township 8, north of range 1, west of the 4th P. M., lying in Warren county.  The facts in the case are fully stated in the opinion.

Messrs. GOUDY & CHANDLER, for the appellant.

Messrs. FROST & TUNNICLIFF, for the appellees.

Mr. JUSTICE LAWRENCE delivered the opinion of the Court:

On the 1st of December, 1856, Holloway and Boggess, residing in Warren county, Illinois, entered into a contract with Alexander M. Bruen, of the State of New York, through his agents, Moore, Morton & Co., doing business at Quincy, in this State, for the purchase of the tax title to a quarter section of land situate in said county.  They paid $170 in hand, and by the terms of the contract were to pay $165 on the 1st of December 1857, and $165 on the 1st of December, 1858, and on the payment of these sums, Moore, Morton & Co. were to deliver to them a quitclaim deed from Bruen.  It was understood that Bruen only had a tax title, and the contract called only for a conveyance of such a title.  Holloway and Boggess gave no notes for the unpaid purchase money, the parties both executing the contract.

Soon after this purchase, to wit: on the 12th of May, 1857, one Mason conveyed to Holloway and Boggess an undivided half of what was believed to be the patent title to the same land.  Boggess conveyed his interest to Holloway in October, 1860, and the land was subsequently sold under a judgment and execution against the latter, to James Thompson, the appellant herein, and on the 1st of August, 1863, the sheriff made him a deed.  The other undivided half of the patent

title passed by several conveyances from Mason to Knight, in whom it vested on the 4th of June, 1864. Before Mason conveyed the second undivided half, he had an understanding with Holloway and Boggess, that the purchase by them of the tax title from Bruen should be for their common benefit, and he paid them $250 as his share of the purchase money.

It appears, then, that in 1864, Thompson claimed an undivided half of the land under the patent title, derived from Mason though Holloway and Boggess, and Knight the other undivided half under the same title, derived from Mason, through another channel, and both had an equal equitable interest in whatever rights Holloway and Boggess held under their contract with Bruen for the tax title.

The land in the mean time, had remained vacant, and on the 12th of October, 1864, Benjamin Lombard jr., made a quitclaim deed to Otis A. Turner, purporting to convey the land, but without, so far as this record discloses, having any pretense of title, and on the next day Turner took possession, and put one Taft thereon as his tenant. This being done, Turner at once proceeded to Quincy, and there saw Moore & Sherman, the successors of Moore, Morton & Co., for the purpose of buying the Bruen tax title.

Holloway and Boggess had made no payment upon their contract with Bruen since it was made, a period of about eight years. From April, 1860, up to this date, Moore & Sherman had made repeated applications for payment, but in vain. They had the deed of Bruen ready for delivery on payment of the purchase money. Holloway and Boggess had become insolvent in 1860.

The contract of Bruen was in this condition when Turner called on his agents to buy the tax title. They at once wrote Bruen informing him of the insolvency of Holloway and Boggess, the apparent hopelessness of payment from them, of the occupancy of the land, which they state to be under the patent title, and of the application by the occupant to buy

the tax title. Bruen replied, authorizing them to sell. Before, however, they had acted under his letter, Knight had learned that possession had been taken of the land, and supposing it was in some way connected with the tax title, he went to Quincy, saw Moore & Sherman, explained his connection with the land, and obtained from them a month's indulgence for paying the amount due, within which time he promised it should be paid.

Soon after this, Turner and Lombard saw Knight and it was arranged between them, that Turner and Lombard should advance the money for the purchase of the tax title; that it should be conveyed to Turner; that Knight should convey his patent title to Turner as security for the money thus advanced, and that on Knight's refunding to Turner one half the sum advanced, Turner should convey to him one half of both titles. Turner and Knight went together to Quincy, saw Moore & Sherman, and carried out this arrangement, Turner paying the money and receiving the deed formerly sent by Bruen, the blank left at its execution for the name of the grantee being filled up with his name.

Sometime in the ensuing winter, Holloway went to Quincy with money furnished him by appellant, Thompson, tendered payment to Moore & Sherman, which was refused, and thereupon Thompson filed this bill, making parties, Turner, Bruen, Knight, Benjamin Lombard, David Lombard, to whom Turner subsequently conveyed, and Taft, the occupant. The bill prays that the title obtained by Turner be set aside, that Bruen be decreed to convey an undivided half of the tax title to complainant, and that partition be made between Knight and complainant, and the latter put in possession of his portion of the premises. The court, on the hearing, decreed the payment by Turner to the complainant, of the $170 paid by Holloway and Boggess to Bruen on the making of the contract in 1856, with interest from the date of payment, but denied all other relief, and the complainant appealed.

It is urged by counsel for appellant, that this is not to be viewed as a bill for specific performance against Bruen, but rather as a proceeding to compel Turner and the Lombards to give up a title which, it is alleged, was really obtained by them under the contract of Holloway and Boggess. It is insisted that the deed was made to Turner, not as a rescission of that contract, but in execution of it, and that Turner procured the deed to be made in his name by fraudulent representations.

The theory that the deed was made as an execution of the contract with Holloway and Boggess, is not sustained by the proof. It appears by the testimony of both Moore and Knight, that the claims of Holloway and Boggess were canvassed by the parties when the deed was made, and Moore & Sherman insisted their rights were lost by non-compliance with the terms of the contract, and that they, Moore & Sherman, could, as agents of Bruen, sell to whomsoever they pleased. They supposed, in selling to Turner, they were cutting off all claims on the part of Holloway and Boggess, and intended so to do. The old contract cut no further figure in the new sale than this: they knew Bruen, from his answer to their recent letter, would be content with a sale to any person by which he would realize the same amount that he would have realized if the first contract had been carried out, and they merely referred to that as a basis for fixing the price on the new sale; but that the deed was regarded as an execution of the old contract, or that the agents of Bruen supposed they were not rescinding it in selling to Turner, and annulling all claims of Holloway and Boggess, is clearly contradicted by the evidence.

Were there, then, any fraudulent representations by Turner in procuring this deed, which entitle the complainant to relief? The record shows none, whatever. When Turner made his first application to Moore & Sherman to purchase the tax title, and claimed to be in possession, as he was, he

may also have claimed to have had the patent title, though the only proof to that effect is the statement in the letter of October 15th, 1864, from Moore & Sherman to Bruen, that the occupant was in possession under the patent title. They do not even say that the occupant had so stated, and it may have been merely a conjecture of their own. But, however this may be, when, subsequently, Turner and Knight called and the sale was really made to Turner, and the deed delivered to him, it is not claimed, and there is no ground in the record for claiming that any false statements were made by Turner, or any deceit practiced. Moore & Sherman had already been informed by Knight, at his first interview with them, that he and Thompson claimed the patent title. From the fact that Turner was now acting in concert with Knight, it was clear he had made some arrangement satisfactory to the latter, and it was understood by all parties that all rights, either of Holloway and Boggess, or their grantees, under the old contract would be destroyed by their new deed. All that Moore & Sherman desired to do, was, to sell the tax title of their principal to any one who would pay for it such a price as to secure him from any loss in consequence of their failure to collect from Holloway and Boggess, knowing, as stated in their letter to Bruen, that they could not by means of that title evict an occupant.

If, then, the sale to Turner was made as a rescission of the old contract, and if no fraudulent representations were made by him, nor any deceit practiced, the only remaining question is, whether the mere fact that, when he bought, he knew of the outstanding contract to Holloway and Boggess, rendered his purchase illegal, and would justify a court of chancery in cancelling his deed. This brings us to the question of specific performance, for it is self-evident if the appellant had no right to compel a deed from Bruen at the time of the sale to Turner, he can not compel the latter to relinquish his title merely because he bought with notice of the old contract. If Bruen

could treat the right of Holloway and Boggess to a specific performance as lost by their failure to perform, and if he was at liberty to sell to another, then clearly the knowledge of the contract would not make it improper for another to buy.

Questions of specific performance have been so often before this court, and the leading principles which govern them are so well settled, that it is hardly necessary to cite the authorities. In this case, it is true, time was not made specifically of the essence of the contract, and there was no clause of forfeiture, but a court of equity will not decree a specific performance, even of contracts which have no such provision, if the purchaser has been guilty of gross and inexcusable *laches* in performing his part of the agreement. That there was such *laches* in the present case, admits of no denial. The only payment ever made by the purchasers was that made in 1856, when the contract was executed. The last payment fell due in 1858. The agents of Bruen had his deed ready for delivery from the first. In 1860 they began to press for payment, and continued to do so, but without avail, until they sold the land to Turner. In this alone there was great *laches* on the part of the purchasers; but there are other features in the case which render it more inexcusable, and made the subsequent sale to Turner necessary for Bruen's protection. Neither Holloway and Boggess, nor any one under them, had taken possession of the land, but they had allowed a third person to enter. They had become insolvent, so that their personal liability on the contract was valueless to Bruen. The title of Bruen was a tax title of the years 1823 and 1833, and was therefore worthless as a title, unless accompanied by possession in such way as to create a bar under the statute of limitations. Thompson, as a purchaser under the judgment and execution against Holloway, would not be bound by the covenants in the contract of Holloway and Boggess with Bruen. Bruen, therefore, to secure his purchase money, had only the personal liability of his insolvent purchasers, as his

title gave him no lien on the land, and would not enable him to evict the intruder whom the purchasers had permitted to enter.    To hold that, under such circumstances, Bruen was not at liberty to sell in 1864 to Turner, leaving Holloway and Boggess at liberty to assert whatever legal rights they might have against him for the instalment of the purchase money already paid, and which, in this case, the court has decreed to them with interest, would be to hold that one party to a contract may violate it with impunity, neither impairing his own rights under it, nor giving the other party liberty to protect himself against irreparable loss.    The law does not thus hold.

Again, how is the new-born eagerness of the appellant to pay the amount due on this contract in the winter of 1864-5 to be explained ?    He had learned, probably, that possession had been taken, and either knew or feared that it was under the tax title. · This might jeopardize his patent title, and then it is that he comes forward and offers to perform.    After four or five years of unavailing effort on the part of Bruen's agents to obtain payment, and having recourse only against insolvent purchasers, must we not doubt whether this offer to perform would ever have been made, if Bruen had not been at liberty to sell his tax title to a third person.

There is another feature in this case damaging to the claim set up in this bill.    Knight was the equitable owner of an undivided moiety of the interest arising under this contract, and his grantor, Mason, had long since paid to Holloway and Boggess one-half the purchase money.    Instead of paying this money to Bruen, they had put it in their own pockets, thereby doing an equal wrong to Bruen and to Mason, and those claiming under him.    Knight, thus circumstanced, was at liberty to resort to any honest means for his own security, without regard to the interests of Holloway and Boggess, and for this purpose he made the arrangement with Turner, and was present, consenting to the sale to him.

We can find no where, in all the details of this transaction, anything to relieve Holloway and Boggess from the charge of gross *laches*; and we can hardly resist the conclusion that they had abandoned all intention of paying the amount due until awakened to the importance of doing so by the fear that their patent title would become worthless. This view is strengthened by the testimony of Boggess himself, who swears that after the last payment was due, he "went to Quincy to pay off the contract, but appropriated the money otherwise, and no further attempt was made by the firm, so far as he knew, to pay it." He retired from the firm in 1860, and parted then with his interest in the contract. He gives as a reason why the contract was not paid, while he was in the firm, that they thought it of no value, and in an interview with Holloway—we suppose subsequently to the dissolution—he told him he would not pay if in his place; to which Holloway made no reply.

If Benjamin Lombard had no claim to this land when he conveyed to Turner, and this record discloses none, the making of that deed, and the taking possession by Turner, must be considered as steps taken by them with a view, probably, of purchasing a title subsequently, under which they could defend their possession, and making use of their possession as a means of buying the title at a lower rate.

If such was their scheme, it was morally censurable, and the entry of Turner was a trespass upon the rightful owner, for which the law furnished a remedy, but with which we have nothing to do in this proceeding. This trespass did not affect the relations existing between Bruen and Holloway and Boggess, under their contract, nor excuse, in any way, the gross *laches* of the latter. It impaired the security of Bruen, but he is not here complaining. It certainly did not restore to Holloway and Boggess the right which they had already lost by their own gross *laches*, to insist on a specific performance of their contract with Bruen. Nor did it take from Lombard

and Turner the right to buy Bruen's title—a right, it was most important to Bruen, they should exercise. To hold they lost that right by their trespass, would be to sacrifice Bruen, who has been guilty of no default, to the interest of Holloway and Boggess, who have been grossly indifferent to the obligations of their contract. The acts of Lombard and Turner undoubtedly resulted in a loss to Holloway and Boggess, or to the complainant, their grantee; but this loss is directly chargeable to themselves, and their disregard of their covenants. Great indulgence had been shown them by Bruen, and if they ultimately lose the land, the fault must lie at their own door. Bruen had the right to sell, and Turner and Lombard the right to buy. They had such right before the entry of Turner, and this entry did not destroy it. It may have enabled them to buy of Bruen on better terms, but with that, this complainant is not concerned. It did not make their purchase fraudulent, nor furnish any ground upon which the title can be taken from them. The decree must be affirmed.

*Decree affirmed.*